```
 1                IN THE UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MICHIGAN
 2                        SOUTHERN DIVISION

 3   UNITED STATES OF AMERICA,      )
                                    )
 4              Plaintiff,          )
                                    )     Criminal Case No.
 5   -vs-                           )
                                    )     2:21-cr-20747-TGB
 6   KYLE ALLAN KENNARD,            )
                                    )
 7              Defendant.          )
     _____

 8

 9              ARRAIGNMENT and DETENTION HEARING
          BEFORE THE HONORABLE JONATHAN J.C. GREY
10             UNITED STATES MAGISTRATE JUDGE
                  Friday, February 11, 2022
11

12   APPEARANCES:

13   FOR THE GOVERNMENT:    DAVID J. PORTELLI, ESQ.
                            United States Attorney's Office
14                          211 W. Fort Street, Suite 2001
                            Detroit, Michigan 48226
15                          (313) 226-9100

16   FOR THE DEFENDANT:     STEVEN E. SCHARG, ESQ.
                            615 Griswold, Suite 1125
17                          Detroit, Michigan 48226
                            (313) 962-4090

18

19   RECORDED BY:           Nahin Ahmed

20   ALSO PRESENT:          Sandra Osorio, Case Manager

21   TRANSCRIBED BY:        Darlene K. May, CSR, RPR, CRR, RMR
                            231 W. Lafayette Boulevard
22                          Detroit, Michigan 48226
                            (313) 234-2605

23

24      (Transcriber not present at live proceedings.  Transcript
                produced from digital voice recording.)

25
```

TABLE OF CONTENTS

PROCEEDINGS:                                                    PAGE:

  Appearances

  Preliminary Matters before Hearing                              4

  Arraignment                                                     4

  Detention Hearing

     Argument by Mr. Portelli                                     5

     Argument by Mr. Scharg                                      25

     Reply by Mr. Portelli                                       30

     Court's Ruling                                             35

  Court Reporter's Certificate                                   45

1             Friday, February 11, 2022

2             3:24 p.m.

3                          -- --- --

4             THE CLERK OF THE COURT:  Now calling case number

5    21-20747, the United States of America versus Kyle Allan

6    Kennard.

7             MR. PORTELLI:  Good afternoon, Your Honor.  David

8    Portelli on behalf of the government.

9             Mr. Kennard is here to complete his arraignment and

10   also for a detention hearing.

11            THE COURT:  Good afternoon.

12            MR. SCHARG:  Good afternoon, Your Honor.  Steven

13   Scharg on behalf of Mr. Kennard.

14            THE COURT:  Good afternoon both to you, Mr. Portelli,

15   as well as to you, Mr. Scharg and Mr. Kennard.  If you all

16   would just give me one moment.

17       (Pause.)

18            THE COURT:  This is the day and time set for the

19   detention hearing, as Mr. Portelli noted.  And will the

20   detention hearing be proceeding today?

21            MR. PORTELLI:  I'm sorry, Judge?

22            THE COURT:  Will the detention hearing be proceeding?

23            MR. PORTELLI:  Yes, Your Honor.

24            THE COURT:  Thank you.  You may proceed with both

25   proffer and any facts, as well as argument.

1    MR. PORTELLI:  Okay.  I just want to make sure, unless

2    the Court wishes otherwise, that the defendant has tendered an

3    acknowledgement of indictment form.

4    THE COURT:  Thank you.

5    I do not have ...

6    Maybe I do.  So we're also completing arraignment?

7    MR. PORTELLI:  Yes.  I'm sorry, Judge.

8    THE COURT:  Thank you.  I do have it.  So before we

9    turn to the detention hearing, we'll complete the arraignment.

10    Mr. Kennard, is this your signature on the document?

11    THE DEFENDANT:  Yes, Your Honor.

12    THE COURT:  So this document indicates that you

13    understand that you've been charged with conspiracy to possess

14    with intent to distribute controlled substances including

15    fentanyl, methamphetamine, cocaine, marijuana and crack

16    cocaine.  And that you understand that if you are convicted or

17    if you plead guilty, there's a mandatory minimum time of

18    imprisonment of ten years up to life and up to a

19    ten-million-dollar fine.  There's also a term of supervised

20    release of at least five years.

21    Count Two, conspiracy to launder monetary instruments

22    is punishable by a term of imprisonment up to 20 years and a

23    fine of the greater of $500,000 or twice the value of property

24    involved in the transaction.  There's also a term of supervised

25    release up to three years.

1         This document also indicates that you understand that

2    if you're convicted or if you plead guilty, the Court could

3    impose consecutive sentences for each count.

4         Is it true that you understand all of that?

5         THE DEFENDANT:  Yes, sir.

6         THE COURT:  Thank you.

7         And, Mr. Scharg, would you like for the Court to read

8    the substance of the indictment at this time?

9         MR. SCHARG:  No, Your Honor.  We'll waive the formal

10   reading and stand mute to the charges.

11        THE COURT:  Thank you.

12        Having heard that, Mr. Kennard, the Court will enter a

13   plea of not guilty to the indictment at this time.

14        Having completed arraignment, we may now turn to the

15   detention hearing.

16        Mr. Portelli?

17        MR. PORTELLI:  Thank you, Your Honor.  At the outset,

18   let me indicate this is a presumption case under the statute

19   under the Bail Reform Act due to the nature of the case.  And

20   this case doesn't just provide for a ten-year maximum sentence,

21   but a sentence of up to a lifetime in prison.  I also note that

22   pretrial services has filed a report and they recommend

23   detention.

24        Judge, earlier today, the government submitted to the

25   Court, and gave a copy to defense counsel, of a written proffer

1   in support of detaining defendant Kyle Kennard pending trial.

2           I also took the liberty last night of speaking with

3   Mr. Scharg personally over the phone and advising him of some

4   of the salient facts that the government thought were important

5   to the detention issue.

6           This indictment, Judge, involved a drug trafficking

7   organization that engaged not only in trafficking some drugs

8   but trafficking an immense amount of drugs.  Evidence gathered

9   shows that over a million pills of fentanyl have -- are

10  involved in this, as well as methamphetamine, cocaine, crack

11  cocaine and other substances including marijuana.

12          The defendant himself, as I will point out, has a

13  supervisory role in this organization and he has also utilized

14  an alias name with an alias identification card for the purpose

15  of -- among other things, I suppose, engaging in monetary

16  transactions.  For example, somebody sent money from the state

17  of Michigan over to a state in the western United States in the

18  name of Cajuan Johnson, C-a-j-u-a-n, Johnson.

19          And when Cajuan Johnson went to pick up the money, he

20  had to show an identification card.  The identification card

21  was in the name of Cajuan Johnson.  I believe it was an Alabama

22  or some southern state driver's license or state ID in the name

23  of Cajuan Johnson with his picture on it.

24          So let's get into some of the factual basis for the

25  charges and then, Judge, the government wants to illicit -- to

1  tell you about what happened at his arrest.  Because he was

2  noncompliant and a bunch of guns were found at his house.

3         But let's start -- and the guns were loaded.

4         So some of the big events that happened here involved

5  airport seizures.  One of the things that would happen in this

6  case is that drugs would be shipped out from Phoenix to

7  Detroit.  Oftentimes it was on an air -- on airplanes.

8  Oftentimes it was in luggage of either passengers or so-called

9  ghost bags where someone buys a ticket, goes to the airport

10 with luggage, gets their luggage -- the bag tag on the luggage,

11 puts the baggage through but doesn't get on the airplane.  So

12 that the bags travel unaccompanied to Detroit and are picked up

13 by other people other than the person who sent the bag.

14        Then those -- the drugs would be taken into Detroit,

15 divvied up and sent to different places for further

16 distribution.

17        In October of 2020, one of those instances happened.

18 And I'll refer to page four, beginning around page four of the

19 written proffer.  Kapri Oldham who is a defendant in this case

20 was stopped at the airport and the suitcase she had contained,

21 among other things, about a kilogram of cocaine and about

22 $7,900 in currency.

23        Now, she -- what happened is that Oldham had gone in

24 to pick up the bag, but, you know, she couldn't get it or

25 couldn't find it so she sent somebody else in, another woman,

1   to pick up the bag on behalf of Oldham.

2          Well, that's where the bag was seized.  The person was

3   arrested and she -- this woman says, "Well, listen, I was just

4   going in to pick up the bag for Kapri Oldham."

5          So how does Oldham tie in to connect?  Well, the

6   written proffer outlines that, Judge, but just let me highlight

7   it.  Oldham is on the phone with the seizing officers involved

8   in this kilogram seizure and $7,900 of money, and she's talking

9   to them and there's evidence that shows Kennard at the time was

10  telling her what to say, directing her what to say.  And we

11  found that information on Instagram and other social media

12  accounts where it shows that this individual is texting Kapri

13  Oldham telling her what to say.

14         So, number one, that shows, again, the pattern of the

15  drugs being sent from Phoenix to Detroit.  It shows how often

16  women are the couriers or the low level people.  It also shows

17  that this individual is somebody who supervises them.

18         Now, there was another seizure at Detroit Metropolitan

19  airport, this about half a kilo of methamphetamine, over a

20  hundred grams of cocaine and over $3,800 -- I'm sorry -- 3,800

21  units, dosage units of Oxycodone.  That luggage was -- involved

22  a co-defendant also.  A woman named Ramika Boaze.

23         Now, Boaze, when she was caught with the drugs, she

24  said that she was doing it for a friend of hers with a nickname

25  of Whopp Dogg.  Well, through investigation -- oh, by the way,

1     she described him physically and it turns out that it matches

2     Kennard's physical description.

3          But she also provided a phone number and that

4     nickname.  Through investigation, it has been determined that

5     that phone number is a phone utilized by Mr. Kennard.  It was

6     registered to him -- or, rather to another co-defendant, a

7     woman with a last name of Wells-Ivy, I believe.

8          THE COURT:  The phone number that -- the phone number

9     -- let me just make sure I got it.

10          MR. PORTELLI:  Sure.

11          THE COURT:  The phone number that was identified --

12          MR. PORTELLI:  There's a --

13          THE COURT:  -- the phone number that Boaze provided

14     to --

15          MR. PORTELLI:  Yes.

16          THE COURT:  -- law enforcement officers --

17          MR. PORTELLI:  Right.

18          THE COURT:  -- was a phone that Mr. Kennard utilized

19     and it was registered in the name of another co-defendant; is

20     that correct?

21          MR. PORTELLI:  That is correct, Your Honor.

22          THE COURT:  Thank you.

23          MR. PORTELLI:  And the interesting thing about this --

24     another thing, I suppose, is that the Whopp Dogg being

25     identified as Mr. Kennard is that, number one, he has himself

1    identified himself that way and his Instagram account ties into

2    a phone number which demonstrates it's him and he -- on that

3    phone and it also shows the name Whopp Dogg on it.  And he

4    communicates in social media, including on his Instagram

5    accounts, with other people.  Including Leo Todd, who's a

6    defendant in this case, as well as others.  And he has utilized

7    that Whopp Dogg account to do that and to discuss large drug

8    transactions.

9           The -- you can see on page seven a copy of a -- or a

10   photograph of the Instagram and the one that says "Me" is

11   Mr. Kennard.  It lists the address as this Woodward address in

12   Detroit, Michigan.  That is a stone's throw away from his

13   house.  And so while that's not where it's registered to, that

14   shows essentially geolocation information.  That's where the

15   house -- that's -- and that's the -- it's less than -- it's

16   like a couple of blocks, if that, away from the Trowbridge

17   Street house where the defendant has been frequently seen and

18   where he was arrested on February 9th.

19          At any rate, it shows the discussion between him, and

20   as you can see at the top of that screen, Mika, being the

21   shorthand name for Ramika Boaze.

22          Now, last year at about this time, the defendant went

23   over to and was seen driving a car over to this address on

24   Griff (ph) Street.  That was a drug related house utilized by

25   the drug trafficking organization, including Mr. Kennard and

1   Leo Todd and other people.  And quite a few members of this

2   conspiracy and quite a few defendants.

3          At any rate, this car pulls up, the vehicle is rented

4   in Mr. Kennard's name.  In about a three-hour period, a dozen

5   quick traffic incidents occur where people get out, go up to

6   the front door, stay there a very short time and then leave.

7   That, of course, is consistent, as I know the Court is aware,

8   with and indicative of drug trafficking.

9          The government had mentioned the Instagram usage by

10  Mr. Kennard and others, including Leo Todd in this case.

11  Starting around page eight, the government has included a

12  number of discussions, photographs and information.  By no

13  means is it exhaustive, but it's just demonstrative of the

14  drugs and guns that are found by Mr. Kennard and portrayed by

15  him, including in the Trowbridge residence where he lived.

16         You can see on page nine there's a photo showing what

17  looks like Mr. Kennard in his living room of the Trowbridge

18  Street house.  And you can see on the left picture on the

19  bottom of nine a large bag of U.S. currency.  And on the

20  right-hand side you can see, you know, a portion of what

21  appears to be cocaine, either powder or rock cocaine, but

22  pressed cocaine.

23         The following page indicates a larger amount of

24  cocaine that -- and these all just come from the defendants's

25  Instagram account.

1          Now, you can see on page 11 there's more of the same.

2    There's all kinds of U.S. currency laid out there, again, at

3    the Trowbridge Street house, according to investigation.

4          The -- moving along, I mean, there's additional

5    photographs that came from his Instagram account where

6    Mr. Kennard displays it, what appears to be his house, stacks

7    of cash.  You can tell they're hundred dollar bills based upon

8    the picture on page 12.  Again, rubber banded together as is

9    consistent with the activities in this case.

10          On page 12 on the right-hand side at the top right of

11   that photograph, or those two photographs, is a bag of what

12   looks like blue pills.

13          Judge, during this case, blue pills have been seen.

14   They've been sent by luggage by these so-called ghost bags.

15   And they're sometimes contained in Skittles bags, bags that

16   purport to be Skittles candy.  And there are these blue pills.

17   They look just like these pills.  And the ones that have been

18   seized in this case have been tested and they contain fentanyl.

19   And, again, there's over a million pills here involved in this

20   case.  The defendant is charged with the largest quantity

21   chargeable by statute as it pertains to fentanyl.

22          Also here you see cocaine, a brick of cocaine on page

23   12.  Now, that's not just him necessarily bragging about it

24   because there are discussions on his Instagram account with

25   other individuals where they negotiate drugs, including

1   fentanyl.  And I'll cover that in a second.

2           But with respect to that cocaine being pressed in a

3   brick, at the time of his search warrant execution, February

4   9th of this year at his Trowbridge Street house, they found

5   guns -- and I'll get into that.  But they also found a kilogram

6   press, which would be consistent with pressing cocaine into a

7   kilogram brick like this.

8           So that indicates not only that he has likely done it

9   in the past, but he maintained that along with the scale and a

10  sifter at his Trowbridge Street house two days ago, the date he

11  was arrested.

12          I indicated that there's sometimes that these ghost

13  bags are used or other baggages used.  And, you know, what I

14  have on page 13 for the Court's review is luggage with one of

15  these bag tags that appears to be at the Trowbridge Street

16  house.

17          So this indicates that he was also consistent with

18  what Boaze and Oldham and Oldham's friend, the one woman had to

19  say, that he's involved in this luggage.

20          I mean, somebody was going to deliver it to him.  We

21  heard -- we know about that from the earlier portion of this

22  presentation.

23          But not only drugs are present here and depicted on

24  his social media, but there are also firearms involved.  And on

25  page 14, these are firearms that are taken -- pictures taken

1   from his Instagram account from his house.  These aren't

2   hunting rifles.  One of them appears to be some sort of

3   semiautomatic rifle.  Below it appears to be a pistol with an

4   extended magazine.

5          Well, as it turns out, at the Trowbridge Street house,

6   at his house on February 9th, a handgun with an extended

7   magazine was seized, consistent with this gun.

8          On page 14 you can see there's more drugs displayed.

9   A large amount of marijuana.  I know marijuana isn't the same

10  as fentanyl.  And this isn't really a marijuana case for

11  purposes of the government's presentation here.  It just shows

12  that this guy is dealing with all kinds of drugs,

13  methamphetamine, fentanyl, marijuana, and these are.

14         Now, on page 15 there's a portion indicating that -- a

15  discussion with Kennard and somebody else.  And this was in the

16  springtime of last year.  And the discussion talks about what

17  kind of pills they're going to sell.  What kind of deal do they

18  got going on?  They're negotiating a deal.

19         And you can see on the third line down in this

20  discussion, you know, "What's in high demand?  I was going to

21  say them blues.  Like those little blue fentanyl pills."

22         And that's not just my guess because they go on in

23  this discussion to say later on here, on page 17, "Are they

24  real Xanax or fetty or what?"  Fetty is a nickname for

25  fentanyl.

1          And they even get more specific on page 18 of this

2     discussion, third line from the bottom of that discussion they

3     want the fent.  That's fentanyl.  They're negotiating fentanyl,

4     a fentanyl deal.

5          Now, in addition --

6          THE COURT:  And are these purported outgoing messages

7     of Mr. Todd?  Just to clarify, the outgoing is alleged to be --

8          MR. PORTELLI:  Just a moment, Judge.

9          THE COURT:  Pardon me.  Not Mr. Todd, Mr. Kennard.

10          MR. PORTELLI:  Kennard.

11          I'm sorry, Judge.  I don't know the answer to that.

12          THE COURT:  Thank you.

13          MR. PORTELLI:  Oh, incoming says -- on page 17,

14     incoming says, "Just Manny sent to Todo."  So --

15          THE COURT:  Okay.  So the outgoing is purported to be

16     of Mr. Kennard's communications.

17          MR. PORTELLI:  That's what it appears to be.

18          THE COURT:  Thank you.

19          MR. PORTELLI:  But let me continue with mentioning

20     some drug trafficking activity that involved other defendants

21     in this case out of state in the state of Kentucky.

22          The -- it turns out that there was some individuals

23     who drove down, you know, from Detroit to the state of

24     Kentucky.  They were stopped.  It was Smith and Campbell.

25     Smith has yet to make an appearance.

1           But they were stopped by the Kentucky officials and

2    that's when additional bags of these fake Skittles candy, but

3    blue fentanyl pills were found by the Kentucky State Police.

4    The Skittles -- when the police looked at it, they could tell

5    that it wasn't candy.  Hold the Skittles bag and the pills are

6    far smaller than the candy.  Just in time for Halloween.  I

7    opened up a bag of real Skittles to see the size difference and

8    they are considerably different.

9           And the sealing on the bag was different.  The

10   manufacturer seal is crisp and nice.  With these ones,

11   including -- that this organization uses, including in Kentucky

12   and including in that bag that came into Detroit airport, the

13   seal is a little jagged.  It's not a clean looking seal.  It

14   looks -- sure, it's sealed, but it doesn't look like a

15   manufacturer's seal.  But anyway, inside these so-called

16   Skittles bag were more, hundreds and hundreds of these fentanyl

17   pills.

18          Now, I mention that.  I understand that Mr. Kennard

19   wasn't directly involved in that, but he later took a trip to

20   Kentucky and that just shows in the government's mind that the

21   defendant is traveling.  It further demonstrates his risk of

22   ability to flee.  I indicated that he had a fake

23   identification.  We know that he got money in the name of this

24   fake identification and fake name.  So we believe that this

25   goes not only to dangerousness and drug dealing, but also risk

1  of flight and the ability to not only get funds and be

2  dexterous with getting funds through these various monetary

3  transactions, but also the dexterity to get fake identification

4  and have money transferred to you in the name of that fake

5  identification.  That's very relevant to his ability to be a

6  flight risk.

7         THE COURT:  Mr. Portelli, is it your contention

8  that -- in your factual proffer on page 23 that the November

9  4th, 2021 trip from Louisville to -- I guess back to Detroit --

10         MR. PORTELLI:  Yes.

11         THE COURT:  -- that that trip may have been a

12  trafficking trip with similar narcotics --

13         MR. PORTELLI:  Yes.

14         THE COURT:  -- that's your allegation?

15         MR. PORTELLI:  Yes, Your Honor.

16         THE COURT:  Okay.  Thank you.

17         MR. PORTELLI:  Thank you.

18         The government put some phone records -- on Kennard's

19  phone with -- just to demonstrate that how often he was in

20  contact with co-defendants in this case.  You know, hundreds

21  and hundreds of times.

22         So he's had regular contact with the DTO members using

23  that phone, another reason to believe that that's his.

24         The money laundering section has been put in here.  On

25  page 25, the government says that, you know, that Kennard has

1    frequented the MotorCity Casino, which he has, and used the

2    alias name of Cajuan Johnson at that casino.

3            I apologize.  That is not accurate.  He did not use

4    the nickname or alias name of Cajuan Johnson at the MotorCity

5    Casino, although he has been there many times, but rather at

6    the two MGM casinos.  One in Detroit and one in Las Vegas.

7            THE COURT:  And that allegation is that that alias

8    name, Cajuan Johnson, was utilized at the MGM casinos in

9    Detroit and Las Vegas; is that correct?

10           MR. PORTELLI:  That is correct.

11           THE COURT:  And they were utilized by Mr. Kennard?

12           MR. PORTELLI:  Yes, they were.  Because, again, it's

13   that same type of identification I indicated in the name of

14   Cajuan Johnson, although an out of state -- what purports to be

15   out of state identification card, but with Mr. Kennard's

16   photograph on it.  His picture, this fake name.

17           Actually, there is a Cajuan Johnson and we determined

18   that there is a Cajuan Johnson, but this individual,

19   Mr. Kennard, has used his face on that ID.

20           THE COURT:  Thank you.

21           MR. PORTELLI:  Just to be clear about that.

22           Now, we've listed a number of monetary type of

23   transactions, and not wishing to get too lost in the details of

24   this, the general scheme is that drug proceeds, they have to do

25   something with it.  So the general scheme is that the money

1    goes into a bank account and then from there it gets sent out

2    by a bunch of different type of cell phone applications or

3    other things.  It's almost like if you pay for something using

4    Venmo.  It's analogous to that, although I certainly don't say

5    that it's identical to that.  But you can see that there's all

6    kinds of instances where people, including -- including Oldham,

7    Wells-Ivy, that they're dropping money into their account and

8    sending it out to different -- on different methods, even in

9    smaller increments over to Mr. Kennard or to other people.  But

10   Mr. Kennard in particular.

11          So that's important because these transactions show

12   the lengths to what the -- to which the organization will go

13   through, including, Mr. Kennard to disguise the true origin of

14   the money and they're just trying to hide the source and nature

15   of those funds.  Including, as I had mentioned, the cash

16   transfer.  I believe it was from Wells-Ivy to Mr. Kennard out

17   of state in the name of Cajuan Johnson.  And we figured that

18   out because of the ID that he has to show when he goes in to

19   claim the money.  They -- we have a photo -- we have a image of

20   that and it's his face on that.

21          So the defendant does have a criminal history, as the

22   Court has seen in the presentence -- I'm sorry, in the pretrial

23   services report.

24          The -- and they recommend detention.  It's important,

25   Judge, not just because this is a -- you know, a case that has

1  a presumption in it, but because -- but his conduct and the

2  activities at the time of his arrest are very important because

3  it goes beyond just what the charges are to demonstrate his

4  dangerousness.

5          So law enforcement officials go to Trowbridge to

6  execute the arrest warrant.  And they go to the door, knock on

7  the door, announce their presence.  Shortly after that, a woman

8  comes out, a friend of Mr. Kennard's.  I mean, relatively

9  quickly.  Now, we think he's still in there, say the agents, so

10 they keep knocking on the door.  He won't come.  Finally after

11 about five, six, seven minutes, they say if you don't come out,

12 we're going to send a dog in to get you.  Words to that effect.

13 I'm not certain what the exact words were.

14         But then he comes out, only then.  That indicates his

15 unwillingness to comply with authority.  But more

16 importantly -- well, maybe not more importantly, but

17 importantly, the agents go in and what do they see when they

18 get in there?  I mentioned the kilo press, that was there.  I

19 mentioned the electric scale and sifters that are commonly used

20 in drug packaging for large quantities given the size of that

21 press.

22         I think the press was called a brick press or brick --

23 had the name brick on it.  To press a brick rather than some

24 sort of large hockey puck or baseball.  For a brick, a big

25 rectangle.

1          At any rate, the guns are -- that were found are shown

2     in the photographs that are exhibits to the government's

3     written proffer.  One of those guns had an extend -- is a

4     pistol with an extended magazine.  We saw a picture similar to

5     this gun earlier in this written proffer.  And here it shows up

6     again in these pictures.

7          You'll see on -- and that appears to be on page 30.

8     On page 31, the Court can see the -- give me a moment, please.

9          This on page 31 shows two pictures.  The top picture

10    shows an assault type rifle with a scope.  And you can see

11    right under -- right near it is a magazine that is designed to

12    fit into that.  That magazine has ammunition in it.  That was

13    on -- around the staircase.  Just as -- pretty much in open

14    view right as you go.

15         He has a felony conviction, first of all.  So there's

16    another -- and you can see the bottom picture of that is more

17    ammunition in the form of magazines.  You can tell on page 32,

18    that bottom picture, that it's a Smith & Wesson firearm.  That

19    firearm was found in this individual's bedroom somewhere in

20    the -- like in a drawer or some such.  But it was in his

21    bedroom, this gun.

22         Now, ammunition was also found in other places of the

23    house.  By the way, that -- the gun with the extended magazine,

24    that was found in a room but not in his bedroom.  The only gun

25    found in Mr. Kennard's bedroom was the Smith & Wesson pistol.

1          THE COURT:  Thank you.

2          MR. PORTELLI:  But all three of these weapons were

3    found in the house.  There was nobody else in the house when

4    the agents went in there other than Mr. Kennard.  There was

5    this girlfriend who ran out shortly after the police knocked.

6    But other than those two people, nobody was in the house.

7          Page 33 you can see -- you have to look -- there's a

8    plastic Baggie with almost like a red -- I don't even know what

9    you call it.  I guess it's where you seal it.  The red top of

10   the bag.  So if you have a plastic bag and you want to seal it,

11   you press the parts together and run your hands across it to

12   create a seal.

13         You can see the red part of that bag in the open

14   drawer.  And inside that bag was ammunition.  There was other

15   ammunition including --

16         THE COURT:  This is page 33?

17         MR. PORTELLI:  Yes, on page 33.

18         THE COURT:  Thank you.

19         MR. PORTELLI:  There's probably like a -- in the open

20   drawer right there where the little -- you see a plastic bag

21   with a little red stripe where you would seal it up if you

22   picked it up.

23         THE COURT:  My pictures are not in color so I will

24   just note that for the record.  No need to approach.  I will

25   review it prior to making a decision, but, thank you,

1   Mr. Portelli.  You may proceed.

2          MR. PORTELLI:  I do have that.  I'm happy to give it

3   to you.

4          THE COURT:  Thank you.  I do have it electronically.

5          MR. PORTELLI:  Okay.  Thank you.

6          Judge, I'd like to enter into the argument portion of

7   this presentation, if I could.

8          THE COURT:  Please continue.

9          MR. PORTELLI:  The factors the Court should

10  consider -- well, first of all, is that this is a presumption

11  case.  And even so, I think it's helpful to look at some of the

12  factors, the nature and circumstances of the offense charged.

13  This is a lot of fentanyl.  He was a supervisor of individuals

14  in this case.  He wasn't just some mere courier or mule, he

15  supervised them.  He directed them, told them where to come

16  with it and he paid them to do it.  Sometimes he'd pay for

17  airline tickets for them to travel.  He did.  So it's not like

18  he's a nobody in this organization, he's the supervisor.

19          The weight of the evidence in terms of danger and

20  flight, well, aside from the presumptions, we have a number of

21  things.  The firearms in his house.  And this is after all the

22  drug activity.

23          The fact that he was noncompliant when the officers

24  were knocking at his door.  The girlfriend heard.  She came

25  out, he didn't.  Not for five, six, seven minutes or so.

1          His history and characteristics, well, we know he's a

2    supervisor.  Okay.  My review also of this report is that he's

3    unemployed.  It's not -- and I mention that because it's not as

4    if -- I mean, he has no legitimate source of income and yet we

5    see all kinds of stacks of money on his Instagram and social

6    media accounts.  He's buying these couriers' plane tickets.

7    Paying them to deliver it to his house or the gas station near

8    his Trowbridge Street house.  He doesn't have any money

9    legitimately to do it.  The only legitimate real conclusion can

10   be, Judge, I suggest that he's operating in drug proceeds.

11         Furthermore, there's more evidence of drug trafficking

12   just by the very nature of the monetary transactions that he is

13   engaging in.  There are all kinds of convoluted places where

14   somebody drops money into a bank account, it goes to some other

15   person into their account, then it comes by Cash App and

16   piecemeal to him.  Money being transferred in his fake name.  I

17   mean, he has a fake ID to go with it, which he uses to go pick

18   up money and to open accounts and so forth at casinos.  Here

19   and out of state.

20         The drugs involved are serious drugs.  Fentanyl.

21   Thousands -- a million pills of fentanyl.  The money involved

22   that this investigation has uncovered, cash money, are millions

23   of dollars.  And wrapped in bundles with rubber bands, just as

24   we've seen and very similar to the way we've seen in this

25   written proffer.

1            So he's a danger, Judge.  He's a -- and it isn't just

2    because he's a danger on the presumption alone.  He's got guns

3    in this house.  You know, the one with the extended magazine,

4    that handgun, that was loaded.  The gun, the Smith & Wesson

5    pistol in his bedroom, that was loaded.  The assault rifle that

6    was on the stairs, well, it wasn't loaded but guess what, less

7    than my arm's length apart there's a magazine for that, right

8    there.  That magazine had ammunition in it.  That was loaded.

9            This is an individual -- and if you put it all

10   together, Judge, all the facts, the presumption, all the things

11   that the government has gone through, we submit that the

12   presumption holds.  And even if there was no presumption, based

13   upon the nature of the charges and the facts and circumstances

14   that we've thoroughly laid out, there are no combination of

15   conditions that would assure the safety of the community and

16   his appearance in court.

17           So we ask that you detain this individual pending

18   trial.

19           THE COURT:  Thank you, Mr. Portelli.

20           Mr. Scharg, you may proceed.

21           MR. SCHARG:  Thank you, Judge.  As you know, there's

22   two sides to every story.  We know that the government has to

23   show that my client is a flight risk and a danger to the

24   community.  We contend that my client is not a flight risk and

25   he's not a danger to the community.

1          Mr. Kennard is 36 years old.  He's a lifetime resident

2     of this area.  He has college -- he took college courses at

3     Wayne County Community College.  And he was working, but not

4     for a company.  He was working for his mother who has rental

5     properties and he cleans them out, fixes them up, prepares them

6     for sale.

7          At the time of his arrest the other day, my client was

8     not on parole.  He's not on probation.  He has a prior record,

9     back in 2004, Your Honor, pursuant to the pretrial service

10    report.  He has a prior conviction from -- that was almost 20

11    years ago for larceny from a person, which he was on probation

12    for.

13         He had another charge in 2009 which was almost -- is

14    way over ten years ago, about twelve years ago, where he was

15    found convicted of possession with intent to distribute, where

16    he served over two years in prison.

17         While he was released from prison, he never violated

18    any parole conditions.  He never violated any house arrest

19    conditions that was part of his parole, and he complied totally

20    with his parole officer.  He has no prior assaultive crimes on

21    his background.  And going to flight risk, it appears just

22    based on those -- that information alone, Your Honor, would

23    show that Mr. Kennard has no -- you know, has no issues with

24    following orders of the Court.

25         Mr. Kennard was on parole after he was convicted of

1   his 2009 offense, Your Honor.  This conspiracy, as alleged in

2   this indictment, indicates it started in February of 2019 and

3   continued until December 24th, 2021.  My client was in custody

4   for -- until he was released in 2020.

5        So he was not even involved in this conspiracy until,

6   obviously, after he was released from prison and off of parole.

7        You heard from Mr. Portelli indicating that my client

8   was not cooperative with the police at the time that they came

9   to his house to execute the search warrant on February 9.  We

10  know -- excuse me.  One second, Your Honor.

11       (Pause.)

12       MR. SCHARG:  At the time they executed the search

13  warrant, Your Honor, on February 9th, it was early morning

14  hours, 6:30, 7 o'clock in the morning.  It is true that my

15  client was at his home on Trowbridge Street with his

16  significant other.  And by the way, his significant other does

17  have a CPL and she was the owner and registered owner of the

18  weapon that was found in their bedroom, the pistol that was

19  shown in the pictures.

20       THE COURT:  The Smith & Wesson?

21       MR. SCHARG:  Yes, Your Honor.

22       THE COURT:  Thank you.

23       MR. SCHARG:  And when the police were executing the

24  search warrant, knocking on the door, it is true that his

25  significant other did run out of the house.  But my client was

1    in the back bedroom where he was with no clothes on, so he was

2    getting his clothes on before he was able to get his self

3    together out of sleep and complied with the police's orders.

4            During this entire conspiracy, Your Honor, not once

5    did we hear that the police ever confiscated any blue pills

6    from my client.  They never -- you never heard anything from

7    Mr. Portelli indicating that he was ever stopped by the police

8    with weapons in his possession or narcotics in his possession.

9    There has been no showing whatsoever that drugs were ever

10   confiscated from the house on Trowbridge Street.  There has

11   been no pictures shown -- and the pictures shown by the

12   government and in their brief -- in their proffer that would

13   show Mr. Kennard in possession of any drugs or weapons.

14   There's no Instagram picture of him personally seeing his face

15   with that information.

16           We don't have nothing but these Instagram pictures

17   that are showing references that he's involved with this -- as

18   they call it the Todd DTO.  Not the Kennard DTO, the Todd DTO.

19           They have -- they mention paying for tickets at the

20   airport for other people.  There's no pictures of Mr. Kennard

21   ever being at that airport purchasing tickets.

22           What I'm trying to show to the Court, Your Honor, is

23   that these are just allegations that my client has -- there's

24   nothing we can say about the two weapons that were found in his

25   house.  However, we just wanted the Court to know that the

1 pistol, the Smith & Wesson, was registered to his girlfriend.

2       There has been no showing or presented in any picture

3 to the Court that Mr. Kennard was using the fake ID.  We

4 heard Mr. Portelli mention that, but we haven't seen any

5 evidence of that in any of the papers that were presented to

6 the Court where you see Mr. Kennard using that identification

7 or where the picture with his picture on it using the name of

8 Mr. Johnson.

9       Your Honor, we believe that there are conditions that

10 the Court can set that would satisfy the conditions of safety

11 to the community and appearance in court.

12       As indicated earlier, Mr. Kennard has been crime free,

13 has not been convicted of anything for over 12 years.  And he

14 complied with all his conditions even back then when he was on

15 parole.  So we don't believe there's any risk of flight there.

16       With regard to danger to the community, yeah, I --

17 based on the allegations presented by the government with these

18 pictures, there may have been a drug -- drug trafficking

19 organization used by the Todd organization, but there's no

20 indication that connects my client to those drugs that they're

21 showing in these pictures.

22       THE COURT:  Thank you.

23       MR. SCHARG:  I'm sorry?

24       THE COURT:  Pardon me.  I didn't mean to cut you off,

25 Mr. Scharg, you may continue.

1          MR. SCHARG:   Thank you, Judge.

2          So, therefore, Your Honor, we believe that there are

3    conditions that can be met.

4          I've seen earlier today how other defendants in this

5    same conspiracy had worse criminal histories than my client.

6    We're respectfully asking the Court to consider house arrest in

7    this matter.   We understand the serious nature of -- the

8    significance of the amount of drugs that are involved in this

9    conspiracy and we think by placing him on home confinement

10   would protect society but still allow him to appear for any and

11   all court dates and meetings with his attorney.   Thank you,

12   Judge.

13         THE COURT:   Thank you, Mr. Scharg.

14         Mr. Portelli, what is your response to some of the

15   arguments made by Mr. Scharg that, one, this is named the Todd

16   DTO, not the Kennard DTO?   That other individuals were placed

17   on bond.   And while we know that there's somewhat of an

18   individualized assessment to be made, do you have a response to

19   Mr. Scharg's statement?   And then, further -- those are the

20   first two questions.

21         And then further, that there aren't any photographs

22   showing Mr. Kennard purchasing tickets or using an alias.

23         MR. PORTELLI:   Well, let me start with the alias.   I

24   have an agent who looked at that and who told me that there was

25   a -- the name, the identification, I believe it was from the

 1   state of Alabama.  I mean, I don't have it here.  But I have an

 2   agent who looked at it, an image of it, and told me that.  And

 3   quite frankly, I believe the man because it's so detailed and

 4   it ties into a financial transaction where money was sent,

 5   cash, out of state and was picked up by this individual here,

 6   Mr. Kennard.

 7          When he went to pick up the ID -- I mean, the cash,

 8   you have to show an ID.  And that's the ID we're talking about.

 9   And an agent has seen an image of that.  I believe it was a

10   state of Alabama state ID or driver's license.

11          The -- we know also that -- and the agent -- same

12   agent confirmed it that there were accounts opened at casinos

13   in the name of Cajuan Johnson, but with that same ID that I

14   just talked about, the one that the agent looked at an image

15   of.  And it's got Mr. Kennard's picture on it.

16          So I'll start with that first.  That just because I

17   didn't show it here, doesn't mean I haven't presented evidence

18   of that on behalf of the government.  I spoke with an agent who

19   told me that and he told me that all within the last week.  And

20   we've talked about this numerous times beforehand.

21          So as to why it's the Todd DTO, I submit that that's

22   not relevant because it's an individualized thing.  Mr. Todd --

23          THE COURT:  Well, let me just interrupt you briefly.

24          MR. PORTELLI:  Sure.

25          THE COURT:  The allegation is that that undermines

1    your assertion that he's a leader of the drug trafficking

2    organization.

3           MR. PORTELLI:  There's 13 people in here.  It may be

4    called at times the Todd drug organization, but we think the

5    main person in the case is Mr. Garcia.  He's not named Todd,

6    but he's the guy that supplies the drugs.  Does that mean that

7    he hasn't -- he's not supplying the drugs?  Well, of course it

8    doesn't.

9           And I'm not saying that Mr. Todd didn't have a

10    leadership role.  I'm saying this guy did.  He supervised the

11    couriers, the women couriers, bringing drugs back from Phoenix

12    into Detroit.  And we heard how that happened.  And some -- one

13    of the women said, well, it was Whopp Dogg and here's his phone

14    number.

15           Well, we checked into the phone number, it's his.  Oh,

16    yeah, the phone's registered to somebody else, just like maybe

17    that Smith & Wesson is registered to somebody else, but just

18    because it's registered to somebody doesn't mean that

19    Mr. Kennard doesn't have access to it, for example, the gun, or

20    isn't using the phone.  Because he is using the phone.  We have

21    him tied, his phone number, to that Instagram Whopp Dogg

22    account.

23           And he -- there's all kinds of evidence where he

24    speaks with Mr. Todd about drugs.  There's instances here that

25    we've shown where in this -- it's just one example of literally

1  dozens and dozens of discussions on social media that
2  Mr. Kennard is doing concerning drugs.  I picked this one out
3  because it was clear that it was fentanyl.  I thought it would
4  be, you know, useful for the Court to see that this individual
5  doesn't just have pictures of bags of those fentanyl pills, but
6  that he talks about it and tries to negotiate deals with it.
7  Because that's what he did on that Whopp Dogg account, which is
8  tied to the phone that we're talking about.

9         So there's no question he's doing those things.
10  There's no question about -- really, if the government --
11  number one, those photographs that we've shown in this written
12  proffer are at the Trowbridge Street house.  The agents have
13  been inside that house.  We've seen all kinds of photographs of
14  the inside of the house on Instagram and so forth.

15         And there's piles of money, pills, guns.  The gun with
16  the extended magazine that was shown in the photo earlier
17  before the February 2nd arrest, well, that gun looks just like
18  the one that was seized on one of the first floor rooms in that
19  Trowbridge Street house.  That's not registered to him.  He
20  can't have a registered gun.  He's a felon.

21         So the fact -- I mean, I'm sure the Court is aware of
22  numerous instances where somebody has a gun and they're not
23  supposed to have it.  It's illegal.  Unfortunately, it's all
24  too common.  It's so common that it shows up here, too.  And
25  not just a couple of handguns, but one with an extended

1  magazine.

2          And what about that assault rifle?  He's not allowed

3  to have a handgun at all, let alone that.  The guns are loaded.

4  That's a very important fact, Judge.

5          And the other defendants in this case who've come

6  before Your Honor didn't have that situation.  They didn't have

7  loaded guns.  Loaded guns are dangerous.  He's got a kilo press

8  to press drugs.  We didn't find that in any other house.  He's

9  different.  He's got loaded guns.  He's got a kilo press.

10         This individual should be detained, Judge.  He's a

11  danger to the community.  There's no justification for having

12  those weapons.

13         THE COURT:  Thank you.

14         MR. PORTELLI:  Three weapons with high capacity.  And

15  there's not only that, were those weapons loaded as I

16  described --

17         THE COURT:  Thank you, Mr. Portelli.  I am going to

18  interrupt you --

19         MR. PORTELLI:  Okay.

20         THE COURT:  -- to let you know that I will give you

21  one minute to complete your rebuttal.

22         MR. PORTELLI:  Unless the Court has any other

23  questions, I will just be quiet and listen to the Court.

24         THE COURT:  Thank you.  The Court is going to take a

25  brief recess to consider these matters as well as review this

1  admission of the government, the colored photographs that were

2  provided and will return with a ruling.

3          THE CLERK OF THE COURT:  All rise.

4          Court is now in recess.

5      (At 4:23 p.m., court recessed.)

6      (At 4:45 p.m., court resumed.)

7          THE CLERK OF THE COURT:  All rise.  The United States

8  District Court for the Eastern District of Michigan is back in

9  session.

10         You may be seated.

11         Recalling case number 21-20747, the United States of

12  America versus Kyle Allan Kennard.

13         MR. PORTELLI:  Again, Your Honor, David Portelli for

14  the United States.

15         MR. SCHARG:  Steven Scharg on behalf of Mr. Kennard,

16  Your Honor.

17         THE COURT:  Thank you, all.  And we are back on the

18  record in this detention hearing.  And I note that there is a

19  presumption in this matter.  The presumption is that there are

20  no conditions or combination of conditions that can assure your

21  appearance at court proceedings and the safety of the

22  community.

23         There was lots of facts proffered by the government in

24  support of its detention request and then there were also very

25  pointed arguments provided by Mr. Scharg in opposition to that

1 request.

2        And let me just say at the outset that I do find

3 it -- I will note for the record that there are differences in

4 criminal histories from other defendants in this same

5 conspiracy that were released on bond.  So I do note that.  And

6 I also note for the record that Mr. Portelli's arguments on

7 behalf of the government were that more than one individual can

8 be a leader, more than one individual can have responsibility.

9 And the salient proffer or salient facts about leadership were

10 that the ultimate leaders are Mr. Garcia, who was charged in

11 the indictment.  And I'll note for the record that he's charged

12 as defendant one and Mr. Kennard is charged as defendant two.

13        I also note for the record that the amount of drugs

14 attributable to the defendants, at least in looking at

15 defendants one, two and three, which is Mr. Todd, that

16 the amounts are somewhat similar for the defendants, but

17 the largest amount, according to the government's

18 allegations -- and there was a finding by the grand jury of

19 probable cause.  The largest amounts have been attributable to

20 Mr. Kennard.

21        Other aspects -- salient aspects of the government's

22 proffer were that Mr. Kennard directed couriers to transport

23 narcotics and/or to cause bags to be delivered by airlines,

24 that he had a supervisory role in doing that and the government

25 provided information that at least one individual told the

1  government that it was Mr. Kennard who provided her the

2  instructions on what to do.

3          And turning further to the government's proffer, there

4  were multiple -- there was an airport seizure of a bag at the

5  airport that came from Detroit to Phoenix.  This suitcase had a

6  bag tag in the name of Kapri Oldham and inside the suitcase

7  there were packages of cocaine weighing 1,121 gross grams and

8  there was also discovered $7,950 of U.S. currency.  That after

9  this suitcase was retained, that an individual who was not

10 Ms. Oldham actually went to the airport to try to pick up the

11 bag.  Ultimately she is one of the individuals that provided

12 information -- pardon me.  Not that individual.

13         Yes.  She's one of the individuals that provided

14 information that Ms. Oldham told her to pick up the bag in her

15 name.  And, further, there was information about videos on

16 Instagram in the name of Whopp Dogg which has been associated

17 with Mr. Kennard.

18         And the government has alleged that Mr. Kennard was

19 giving specific instructions to Ms. Oldham on what to say to

20 officials about the bag.

21         There were further -- there was a further proffer as

22 provided in the government's submission that there were street

23 narcotic sales by Mr. Kennard on multiple occasions.  And that

24 on Instagram it was documented firearms, including a firearm

25 that appeared substantially similar to a firearm that was

1    seized at the time Mr. Kennard was arrested, as well as a

2    photograph on Instagram of what appeared to be a portion of a

3    kilo of cocaine.

4           In addition to that, photographs of large sums of

5    currency, as well as packed baggage in the names of other

6    individuals and that these photographs appeared to have been

7    taken in Mr. Kennard's residence on Trowbridge.

8           There was also a proffer -- proffered information that

9    Mr. Kennard engaged on Instagram a conversation with another

10   individual about procuring narcotics and indeed what types of

11   narcotics, to include Xanax.  And the allegation was also

12   fentanyl, which was requested by Mr. Kennard for distribution.

13          And there was extensive proffer that multiple

14   individuals -- pardon me -- that, yes.  Multiple individuals

15   were stopped in Kentucky with Skittles bags which contained

16   Fentanyl and that those bags were substantially similar to a

17   prior seizure.  And there was an allegation that Mr. Todd (sic)

18   -- that that second seizure occurred in Kentucky and while

19   Mr. Kennard, not Mr. Todd, was not present in Kentucky at that

20   time, that the government alleges that Mr. Kennard has similar

21   travels to Kentucky and so the government has contended that

22   his trips would have been for the same purpose to distribute

23   the same types of narcotics.

24          There was also a proffer that multiple loaded firearms

25   were recovered from the residence at the time that Mr. Kennard

1   was arrested.  And there was a proffer that Mr. Kennard delayed

2   answering the door when law enforcement officers attempted to

3   arrest him for several minutes.

4           I will just note for the record that I do not find

5   that to be a very strong point.  There appeared to be just a

6   few minutes and I think that information -- there was an

7   alternative explanation that was provided by Mr. Scharg that he

8   was getting dressed and then came to the door.  I did not hear

9   any information that items appeared to have been hidden during

10  that time or anything of the sort that would lead the Court to

11  a determination that he was deliberately attempting to flee.

12          There is a portion of the factual proffer that I did

13  not just summarize and that included statements by the

14  government that there was an alias utilized by Mr. Kennard on

15  multiple occasions and that that alias was utilized to further

16  fraudulent monetary transactions or money laundering

17  transactions, not fraudulent transactions.  That Mr. Kennard

18  has actually possessed an ID in the name of a real person but

19  it's not himself and that he's utilized that ID to receive

20  monetary transactions that are stemming from the narcotics

21  activity.  And it's alleged that Mr. Kennard again has directed

22  individuals to send him sums of money using different types of

23  applications that are similar to Venmo.

24          What this case I believe comes down to today is do I

25  find that you are such a risk of flight or such a danger to the

1   community that there aren't any conditions that can be imposed

2   and differently than the other individuals that were before the

3   Court.

4          And, again, I'm going to reiterate it, it is a little

5   bit troubling to the Court that not this much time appears to

6   have been spent at least in providing this much detail about

7   the specific activities of other defendants, but what I do have

8   to consider is what was provided about you, Mr. Kennard.

9          And this is not a trial today.  You heard a lot of

10  passion from the government, but I'm looking at what are the

11  alleged facts that the government has stated.  And the alleged

12  facts are that you utilized an ID in someone else's name and

13  you directed a large drug trafficking conspiracy.  And I do

14  find that while you're not alleged to be the ultimate leader,

15  you're being alleged to be one of the leaders.

16         So in thinking through and considering each of the

17  3142(g) factors, the nature and circumstances of this offense

18  are obviously serious.  We're talking about a million pills,

19  that's what's been alleged.  But different from other

20  individuals is that firearms have also been alleged to have

21  been a part of your specific activities.  And your attorney did

22  provide information that there was a registered firearm to your

23  girlfriend, but did not -- there was no information about the

24  other two firearms that were recovered.

25         One -- at least one of them which looked very similar,

1   according to the government's proffer, of a photograph that was

2   found on your Instagram page.  So we have guns.  We also have

3   drugs.  Those are a deadly mix and that weighs in favor of

4   detention, most certainly.

5          Turning to the -- and also in considering the fact

6   that it's been alleged that you've been directing people of

7   what to do.  That also weighs in favor of detention.  Whether

8   or not there are other co-leaders or other leaders above you,

9   the allegations that have been presented are that you are a

10  leader.

11         Turning to the risk of flight or danger, I do believe

12  that there might be some conditions regarding risk of flight,

13  but I think that there is still a risk given that there's an

14  allegation that you have utilized an ID that apparently passed

15  some muster at casinos and you were able to engage in monetary

16  transactions, that that in and of itself is a risk of flight

17  when a person has access or knows how to obtain a fraudulent

18  identification in the name of another individual.  But the more

19  important point is danger.  And that again weighs in favor of

20  detention.

21         Looking at your history and characteristics, I find

22  that that is at most a neutral factor.  It's true that your

23  criminal history is not as significant as some of the other

24  individuals.  You don't have the length -- very lengthy

25  criminal history that some other individuals have and it is

1    noted in the record that you don't have any recent convictions

2    in the last five years.

3         But if the government's allegations are true, it's

4    that you are one of the leaders.  So that's also to be taken

5    into account in looking at your history and characteristics.

6    They're saying that that is one of your characteristics, that

7    you're a leader.  So notwithstanding your history of not having

8    multiple serious convictions or -- and certainly not violent

9    convictions as noted by Mr. Scharg, that's at most a neutral

10   factor when looking at the current allegations that were

11   brought forth to the Court.

12        And the last factor is the nature and seriousness of

13   the danger imposed to the community.  The danger with narcotics

14   is that there -- I said this in another case in part, that

15   there is such an appetite for narcotics that people are willing

16   to pay lots of money.  And one of these communications that was

17   proffered by the government talked about the price supposedly

18   that you could obtain for some of the narcotics and it was much

19   higher than in another area.  We know that there is an ongoing

20   epidemic that is often fatal to people who sometimes don't know

21   whether or not they have heroin or another opioid, don't know

22   that there might be fentanyl in it.

23        So looking at that and looking at the specific message

24   that was requesting fent, for short, the government has alleged

25   that that's short for fentanyl, I do find that that is a high

1   risk of danger.  Not that you, yourself, has been alleged to

2   have completed all of these trips, that's not the government's

3   allegations, but there are allegations where that you directed

4   numerous trips, that you provided the instructions on how to

5   do, what to do, and what to say even after at least one of the

6   bags were interdicted by law enforcement officials.  That

7   displays a level and a degree of intelligence that's being used

8   for bad purposes.

9        And, again, these are the government's allegations.

10   You remain innocent of these charges, but in looking at all of

11   the factors, even if there were not a presumption, given the

12   facts that the government proffered about what was located in

13   your home on that day including a kilo press and a sifter and

14   multiple firearms, in addition to the photographs that were

15   recovered from your social media accounts, as well as your own

16   words, according to the government, it's simply too much to be

17   overcome.

18        And so I do find in consideration of each of the

19   3142(g) factors that detention is reasonable and warranted and

20   so you will be detained in the custody of the United States

21   Marshal Service pending trial.  And, again, these are just my

22   findings based upon the government's allegations.  They remain

23   to be tested at trial.  You have a very wise and able attorney

24   and I am sure that he will continue to represent you well as he

25   has today.

1            But that will be the order of the Court.  I will enter

2    a short written order as well.  And so this matter will be

3    adjourned.

4            Judge Terrence Berg will provide all future dates.

5            Is there anything else from the parties?

6            MR. PORTELLI:  No, Your Honor.

7            MR. SCHARG:  No.

8            THE COURT:  Thank you.

9            MR. SCHARG:  No, Your Honor.

10           THE COURT:  Thank you.

11           THE CLERK OF THE COURT:  All rise.

12           Court is now adjourned.

13       (At 5:02 p.m., court adjourned.)

14                        -   -   -

15

16

17

18

19

20

21

22

23

24

25

1        C  E  R  T  I  F  I  C  A  T  E

2

3        I, Darlene K. May, Official Court Reporter for the

4   United States District Court, Eastern District of Michigan, do

5   hereby certify that the foregoing is a true and correct

6   transcript, to the best of my ability, of the digital sound

7   recording of the proceedings in the above-entitled matter.  I

8   further certify that the transcript fees and format comply with

9   those prescribed by the Court and the Judicial Conference of

10  the United States.

11

12  February 28, 2022        /s/ Darlene K. May
    Date                     Darlene K. May, CSR, RPR, CRR, RMR
13                           Federal Official Court Reporter
                             Michigan License No. 6479

14

15

16

17

18

19

20

21

22

23

24

25